MACSTEEL INTERNATIONAL
USA CORP., Plaintiff,

v.

M/V IBN ABDOUN, Her Engines, Boilers, Tackle, etc., United Arab Shipping Co. (S.A.G.), Cargill Marine & Terminal Inc., and Cargo Carriers, Defendants.

No. 99 CIV. 4562(CBM).

United States District Court,
S.D. New York.

Aug. 26, 2002.

Harold M. Kingsley, Kingsley, Kingsley & Calkins, Hicksville, NY, for plaintiff.

Robert A. Milana, London Fischer, LLP, New York City, for defendant United Arab Shipping Co. (S.A.G.).

Gregory G. Barnett, Casey & Barnett, New York City, for defendants Cargo Carriers & Cargill Marine & Terminal.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

This case involves a dispute over a cargo of steel coils that were allegedly damaged during shipping aboard an unseaworthy ocean vessel. The shipper, plaintiff Macsteel International USA Corp. ("Macsteel"), claims that the shipowner, defendant United Arab Shipping Company (S.A.B.) ("United Arab"), is liable for damage to the cargo totaling $1.03 million. Macsteel also claims that a second carrier, operated by defendants Cargill Marine & Terminal Inc. and Cargo Carriers (collectively "CCI"), is liable for damage totaling approximately $12,000.

In an opinion issued on August 3, 2001, the court granted plaintiff's motion for partial summary judgment, holding that United Arab is liable for the damage to plaintiff's steel as a matter of law, and striking United Arab's affirmative defense that the Carriage of Goods by Sea Act imposes a $500 per package limit on its liability. *See MacSteel Int'l USA Corp. v. M/V IBN ABDOUN*, 154 F.Supp.2d 826 (S.D.N.Y.2001).

The parties agreed to try the remaining liability and damages issues on submission. Between January 23, 2002 and February 15, 2002, the parties filed extensive evidentiary materials, proposed findings of fact and conclusions of law, and post-trial memoranda of law. Having reviewed all of the testimony and exhibits received into evidence, the court hereby sets forth its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## BACKGROUND

In June 1998, Macsteel arranged for the transportation of a cargo of steel coil products from Durban, South Africa to various ports in the United States aboard the Ibn Abdoun ("the Abdoun"), an ocean vessel owned and operated by defendant United Arab. During the voyage to the United States, Macsteel's cargo was damaged by prolonged exposure to seawater caused by leaky hatches aboard the Abdoun.

The damage to Macsteel's cargo was discovered when it was discharged at the ports of Puerto Rico, Tampa, New Orleans, and Houston. There the damage was inspected by professional surveyors hired by Macsteel and/or by United Arab. Each of these survey reports has been received into evidence.

Defendant CCI was hired to transport a portion of Macsteel's cargo from New Orleans up the Mississippi River to Chicago on its barge, known as CC8320. This portion of Macsteel's cargo was further damaged while en route to Chicago allegedly by standing rain water in the barge's hopper. Apparently, the barge's pontoon covers were not put in place properly before the voyage from New Orleans. Macsteel's surveyors inspected the damage several months after the cargo arrived in Chicago.

## DISCUSSION

Macsteel, who had presold most of the steel coil cargo at issue to various customers before the cargo left South Africa, has submitted detailed survey reports setting forth the monetary damages it claims to have sustained on a customer by customer basis. For each individual customer, Macsteel offered to sell the customer the damaged cargo at a discount from its fair market value in prime condition. If the customer refused to accept the damaged cargo, Macsteel sold the cargo to the highest bidder as salvage. With respect to most customers, Macsteel claims it was damaged in the amount of the difference between the fair market value of the cargo in its actual condition and its fair market value in prime condition, together with survey fees and other consequential expenses.

Macsteel's damages methodology is, as a general matter, proper. *See, e.g., Seguros Banvenez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 860–61 (2d Cir.1985) ("The correct measure of damages ... is the amount necessary to put the injured parties in the exact position they would have been had there been no breach."). Defendants take issue, however, with certain specific aspects of Macsteel's claims. The court will address each of defendants' specific objections to Macsteel's damages calculations in turn.

### A. Thyssen Steel

█ With respect to its delivery of damaged goods to Thyssen Steel Group–East

("Thyssen Steel") in Tampa, Macsteel claims damages against United Arab totaling $22,909.15, including survey fees and related expenses. United Arab argues that this claim should be deemed time-barred under 46 U.S.C.App. § 1303(6), at least in part, because the second of two surveys commissioned by Macsteel was not performed until November 23, 1999—well more than one year after the cargo was discharged in Tampa. However, section 1303(6) states only that Macsteel was required to initiate this lawsuit—not necessarily to spell out the precise nature of its damages—within one year of discharge. Because Macsteel initiated this lawsuit on June 24, 1999, safely within one year of discharge, United Arab's statute of limitations argument fails.

■ United Arab also argues that it was not provided with notice of Macsteel's claim within three days of discharge as required by section 1303(6). As the case law United Arab cites makes clear, however, a plaintiff's failure to give timely notice under section 1303(6) is not necessarily fatal; rather, it merely gives rise to a rebuttable presumption that the goods were delivered in good order. *See, e.g., Bally, Inc. v. M.V. Zim America,* 22 F.3d 65, 71 (2d Cir.1994). Further examination of Macsteel's evidence is thus required.

■ Having examined Macsteel's evidence, the court finds that Macsteel has not met its burden of proof with respect to this claim, especially in light of the presumption discussed above. Macsteel's claim of damages totaling $22,909.15 is supported by two survey reports—one dated March 31, 1999 and one dated January 26, 2000. To begin with, these survey reports discuss damages, including survey fees and expenses, of $8247.04 and $4283.42, respectively. It is therefore difficult to understand how Macsteel arrived at its total damages figure of $22,909.15. Moreover, the first survey report indicates

that the damage to the cargo was caused by "elements of freshwater while in the custody of the ocean carrier." While it is certainly possible that freshwater damage was caused while the cargo was in the possession of the ocean carrier, the court finds this possibility considerably less likely than if the damage had been caused, say, by ocean water. Indeed, the second survey report fails even to identify the ocean portion of the voyage as the likely cause of the damage, stating in general terms only that the damage was caused by "fresh water at some point in transportation." Especially in light of the presumption discussed above, the court finds that Macsteel has not met its burden of proof with respect to this claim.

### B. Insteel Industries

Macsteel delivered 663 coils of steel to Insteel Industries, Inc. ("Insteel") in Nashville, Tennessee. These 663 coils had a total fair market value in prime condition of $516,135.00. Insteel accepted 243 of these coils as prime and paid $189,171.65 for them. The remaining 420 coils were damaged by seawater aboard the Abdoun. Insteel agreed to accept these 420 damaged coils for the discounted price of $117,121.14. Macsteel claims it is entitled to damages from United Arab in the amount of the difference between the fair market prime and actual values of these 420 coils—$209,842.21—plus survey fees and expenses of $5,735.98.

United Arab claims that it should not be liable for this entire amount because Insteel acted in bad faith in negotiating with Macsteel the discounted price for the damaged coils. United Arab points to the fact that the surveyors estimated the depreciated value of the damaged coils to be 35% below full prime market value, whereas Insteel ultimately bought the coils for almost 65% below full prime market value.

United Arab argues that Insteel acted opportunistically in rejecting delivery of the damaged coils, knowing that the salvage value of the coils would be far less then their true market value, even in damaged condition.

■ As Macsteel correctly points out, however, Insteel had every right under governing contract law to accept or reject the shipment in part or in whole. Once Insteel exercised its legal right to reject delivery of the damaged coils, Macsteel had no choice but to offer the coils to the public in a salvage sale. This salvage sale yielded a high bid of only $76,519—a 76% discount from full prime market value. Insteel then stepped in and offered Macsteel $117,121.14—well more than the coils had fetched from the public salvage auction. Macsteel thus did everything ·in its power to maximize its take on the sale of the coils and mitigate its damages. It simply is not relevant whether Insteel, over whom Macsteel exercised no control, acted opportunistically or whether Insteel secured itself a windfall at the expense of United Arab. The only relevant inquiry is how to make Macsteel whole.

United Arab also argues that Macsteel should be awarded no more than the cost of reconditioning the damaged cargo, which United Arab contends would be far less than the $209,842.21 Macsteel seeks. United Arab cites *Weirton Steel Co. v, Isbrandtsen–Moller Co.*, 126 F.2d 593 (2d Cir.1942), for the proposition that "[r]econditioning of the cargo is an acceptable methodology to determine the actual damages sustained by the cargo." United Arab Br. at 8. As Macsteel correctly points out, however, *Weirton* applied this "remediation" rule of damages instead of the regular "market discount" measure because of the unique circumstances of that case—the plaintiff had not immediately sold the damaged cargo but, rather, had reconditioned them and sold them in a different form for full prime market value. Because Macsteel did not similarly recondition the damaged cargo and sell it for full prime market value, the "market discount" method plainly is a more appropriate damages measure than the "remediation" method. *See Thyssen, Inc. v. S/S Eurounity*, 21 F.3d 533, 539–40 (2d Cir.1994).

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $215,578.19 with respect to the Insteel claim.

### C. Texas Pipe

■ With respect to its delivery of damaged goods to Texas Pipe & Supply Co. ("Texas Pipe") in New Orleans, Macsteel claims damages of $3,851.68—the cost of reconditioning the damaged coils, which was acceptable to Texas Pipe—plus survey fees and expenses of $1,260.25. United Arab asserts in entirely conclusory fashion that these survey fees and expenses were "out of line with the damages." However, United Arab has not offered any meaningful explanation regarding why it believes these survey fees are excessive, and the court finds that the fees are reasonable.

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $5,111.93 with respect to the Texas Pipe claim.

### D. New Process Steel (New Orleans)

With respect to its delivery of damaged goods to New Process Steel Corp. ("New Process Steel") in New Orleans, Macsteel claims damages of $43,738.01, plus survey fees and expenses of $10,256.00. Of the $43,738.01 in claimed damages, $32,329.01 is for actual material loss, and $11,409 is for expenses associated with determining whether New Process properly rejected as damaged the entire shipment of 83 coils. After the coils were transported to a third-party facility for further testing and analy-

sis (at a cost of $11,409), New Process ultimately accepted as prime all but 25 of the 83 coils it had initially rejected. United Arab claims it should not be held responsible for the expenses associated with correcting New Process's unreasonable initial rejection of all 83 coils.

■ The court finds that Macsteel is entitled to be reimbursed by United Arab for the $11,409 in additional expenses. It is not relevant whether New Process, over whom Macsteel exercised no control, acted unreasonably when it initially rejected all 83 coils as damaged. It is the fault of United Arab, not Macsteel, that New Process was faced with the task of sorting damaged coils from prime coils in the first place, and its must be the goal of this court to make Macsteel whole. The court finds that the $11,409 in additional expenses, while unnecessary with the benefit of hindsight and thus regrettable, fall squarely into the category of reasonably foreseeable consequential damages to which Macsteel is entitled.

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $53,994.01 with respect to the New Process Steel (New Orleans) claim.

### E. New Process Steel (Chicago)

With respect to its delivery of damaged goods to New Process Steel in Chicago, Macsteel claims damages totaling $159,624.18. Of this total, it is alleged that defendant United Arab is responsible for $131,866.82 (for damage allegedly caused at sea), and that defendant CCI is responsible for $11,828.30 (for damage allegedly caused during inland barge transportation). The remaining $15,929.06 is for survey fees and expenses.

■ United Arab claims that it is responsible for at most $60,351.48. United Arab relies on the deposition testimony of its surveyor, John Van Lieshout, who tes-

tified that more than half of the damage was caused by freshwater, and that only 42% of the damage, or perhaps "a point or two higher," was caused by seawater during the ocean voyage. Tellingly, Macsteel failed even to respond to United Arab's plausible argument that the majority of the claimed damages could not have been caused at sea. Indeed, the chemical analyses relied upon by Macsteel's surveyors could not definitively conclude that seawater caused the damage to the coils in question because of the presence of other foreign substances containing sodium. Accordingly, the court finds that Macsteel has met its burden of proving only that United Arab caused $60,351.48 of the damage. The court also finds that United Arab is responsible for 80% of the survey fees, which comes to $12,743.25.

Accordingly, Macsteel is entitled to judgment against United Arab in the amount of $73,094.73 with respect to the New Process Steel (Chicago) claim.

CCI claims that Macsteel has not met its burden of proof with respect Macsteel's $11,828.30 claim against CCI. The lone piece of evidence Macsteel offered in support of this claim is the report of its surveyors, which concluded without significant analysis that the damage was caused by rainwater entry into the hopper of CCI's barge due to improperly placed pontoon covers. As CCI points out, however, Macsteel has not offered any evidence regarding how the cargo was handled, stored, and cared for between the time it was discharged in Chicago and the time it was surveyed months later. Because Macsteel did not even respond to CCI's argument, and because the court finds CCI's argument persuasive, the court holds that Macsteel has not met its burden of proof with respect to its claim against CCI.

## F. Russell–Stanley

With respect to its delivery of damaged goods to Russell–Stanley Corporation ("Russell–Stanley") in Houston, Macsteel claims damages of $192,841.54, plus survey fees and expenses of $12,873.75. United Arab argues that the coils in question were sold to Russell–Stanley several days *after* their delivery—that is, that the coils were not pre-sold—and that Macsteel therefore is only entitled to material loss damages of $180,153.37, not the full $192,841.54 Macsteel claims.

There are two flaws in United Arab's argument. First, the court in all candor cannot understand how United Arab arrived at its proposed $180,153.37 figure. *See* United Arab Br. at 16–17. More importantly, United Arab plainly misstates the law in asserting that Macsteel "is not entitled to recover resale value for cargo not pre-sold." *Id.* at 17. To the contrary, the very cases United Arab cites make clear that the proper measure of damages "is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value in the condition in which they actually did arrive." *ETS Gustave Brunet, S.A. v. M.V. Nedlloyd Rosario*, 929 F.Supp. 694, 710 (S.D.N.Y.1996). Macsteel's survey report demonstrates that the difference between the fair market prime value of the coils and their salvage value, together with reasonable expenses associated with evaluating the damaged goods, was $192,841.54. The court also finds that Macsteel's claimed survey fees and expenses are reasonable.

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $228,391.36 with respect to the Russell–Stanley claim.

## G. May Fabricating

With respect to its delivery of damaged goods to May Fabricating Co. Inc. ("May Fabricating") in Houston, Macsteel claims damages of $113,713.41, plus survey fees and expenses of $4,275.85. As with the Russell–Stanley claim, United Arab argues that Macsteel did not pre-sell the coils in question to May Fabricating and thus that Macsteel is entitled to no more than $85,215.01 in actual damages. Again, however, Macsteel's survey report demonstrates that the difference between the fair market prime value of the coils and their salvage value, together with reasonable expenses associated with evaluating the damaged goods, was $113,713.41. The court also finds that Macsteel's claimed survey fees and expenses are reasonable.

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $117,989.26 with respect to the May Fabricating claim.

## H. NAFTA

With respect to its delivery of damaged goods to NAFTA Steel & Pipe Inc. ("NAFTA") in Houston, Macsteel claims damages and incidental expenses of $45,417.56, plus survey fees and expenses of $3,058.00. As with the Russell–Stanley and May Fabricating claims, United Arab argues that Macsteel did not pre-sell the coils in question to NAFTA and thus that Macsteel is entitled to no more than $33,174.13 in actual damages. Again, however, Macsteel's survey report demonstrates that the difference between the fair market prime value of the coils and their salvage value was $41,711.75. Macsteel also claims incidental expenses of $3705.81, although its own survey report demonstrates that its incidental expenses were only $1544.55. The court also finds that Macsteel's claimed survey fees and expenses are reasonable.

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $46,314.30 with respect to the NAFTA claim.

### I. Vass Pipe

■ With respect to its delivery of damaged goods to Vass Pipe and Steel Co. ("Vass Pipe") in Houston, Macsteel claims damages of $40,411.29, plus survey fees and expenses of $1,579.60. United Arab claims that Macsteel's damages should be limited to $15,000.00, the cost of reconditioning the damaged cargo. As discussed previously, however, United Arab is not entitled to avail itself of the "remediation" measure of damages because, unlike in the *Weirton* case, Macsteel did not recondition the coils and sell them for full prime market value.

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $41,990.89 with respect to the Vass Pipe claim.

### J. Madix

With respect to its delivery of damaged goods to Madix, Inc. ("Madix") in Houston, Macsteel claims damages of $30,674.85, plus survey fees and expenses of $3,959.95. As with the Russell–Stanley, May Fabricating, and NAFTA claims, United Arab argues that Macsteel did not pre-sell the coils in question to Madix and thus that Macsteel is entitled to no more than $24,368.28 in actual damages. Again, however, Macsteel's survey report demonstrates that the difference between the fair market prime value of the coils and their salvage value, together with reasonable expenses associated with evaluating the damaged goods, was $30,674.85. The court also finds that Macsteel's claimed survey fees and expenses are reasonable.

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $34,634.80 with respect to the Madix claim.

### K. Trident

With respect to its delivery of damaged goods to Trident Steel Corporation ("Trident") in Houston, Macsteel claims damages of $23,532.16—the cost of repairing the damaged goods—plus survey fees and expenses of $4,981.30.

United Arab first argues that it is not responsible for the $506.25 spent on rebeveling because that charge was not "voyage related." The court rejects this argument, however, because United Arab cites no evidentiary support whatsoever for its position. According to Macsteel's survey report, the rebeveling was necessary because of damage sustained during the ocean voyage.

United Arab also challenges the $523.68 in "extra expenses" Macsteel claims, arguing that it is not responsible for this item because it pertains to storage fees incurred after the reconditioning was completed. Because Macsteel has not responded to United Arab's convincing argument, the court sustains United Arab's objection to this item.

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $27,989.78 with respect to the Trident claim.

### L. Watko Tanks

With respect to its delivery of damaged goods to Watco Tanks, Inc. ("Watko") in Houston, Macsteel claims damages of $21,047.54, plus survey fees and expenses of $1,205.30. As with the Russell–Stanley, May Fabricating, NAFTA, and Madix claims, United Arab argues that Macsteel did not pre-sell the coils in question to Watko and thus that Macsteel is entitled to no more than $15,942.67 in actual damages. Again, however, Macsteel's survey

report demonstrates that the difference between the fair market prime value of the coils and their salvage value was $21,047.54. The court also finds that Macsteel's claimed survey fees and expenses are reasonable.

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $22,252.84 with respect to the Watko claim.

### M. Tex–Tube

With respect to its delivery of damaged goods to Tex–Tube Company ("Tex–Tube") in Houston, Macsteel claims damages of $15,222.57, plus survey fees and expenses of $2,998.90. As United Arab points out, however, Macsteel's survey report makes clear that $3,579.45 of its claimed damages was paid by the manufacturer to account for a manufacturing defect in two of the coils. Accordingly, United Arab is not liable to Macsteel for this amount.

United Arab further argues, without any evidentiary support, that it is not responsible for $11,331.30 of Macsteel's remaining actual damages because this amount pertains to metal scraps that were cropped during manufacturing and thus "would be lost anyway." United Arab Br. at 20. The court rejects this argument because Macsteel's survey report makes clear that this $11,331.30 figure pertains to damage caused during shipping.

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $14,642.02 with respect to the Tex–Tube claim.

### N. Galvmet

With respect to its delivery of damaged goods to Galvmet in Houston, Macsteel claims damages and incidental expenses of $2,603.84, plus survey fees and expenses of $1,159.95.

United Arab correctly points out that according to Macsteel's own survey only one of the two coils in question was damaged by seawater. The second coil was damaged by "improper handling," and there is no evidence in the record demonstrating who is responsible for this damage. Macsteel's survey thus demonstrates that it is entitled to recover only the difference between the prime market and salvage values of the coil corroded by seawater, which comes to $1,718.30 (half of the $6,055.05 prime market value for the two coils, less $1309.23 in salvage proceeds for the coil corroded by seawater). Macsteel also is entitled to recover half of the $165.40 it claimed in incidental expenses plus all of its survey fees and expenses.

Accordingly, the court finds that Macsteel is entitled to judgment against United Arab in the amount of $2,960.95 with respect to the Galvmet claim.

### O. M & M Manufacturing

With respect to its delivery of damaged goods to M & M Manufacturing Company, Inc. ("M & M Manufacturing") in Houston, Macsteel claims damages, including survey fees and expenses, of $3,613.65. As United Arab points out, however, Macsteel's own survey indicates that the damage was caused by "fresh water of an unknown source." Because Macsteel has not even responded to United Arab's argument, and because the court finds the argument persuasive, the court holds that Macsteel has not met its burden of proof with respect to this claim.

### P. Cody

With respect to its delivery of damaged goods to Cody Company, Inc. ("Cody") in Houston, Macsteel claims damages of $596—the cost of reconditioning the damaged steel. United Arab argues that this claim should be disallowed be-

cause the surveyor did not personally inspect the coils and because his report does not indicate how the coils were damaged. The court agrees that Macsteel has not met its burden of proof with respect to the Cody claim.

### Q. New Process Steel (Houston)

With respect to its delivery of damaged goods to New Process Steel in Houston, Macsteel claims damages, including survey fees and expenses, of $19,574.99. United Arab observes that Macsteel did not provide it with notice of the alleged damage within three days of discharge. As discussed above, this omission gives rise to a rebuttable presumption that the goods were delivered in good order.

The court finds Macsteel's New Process (Houston) claim to be particularly confusing. There appear to be at least two errors in Macsteel's damages calculation. First, Macsteel claims actual damages of $14,326.89, incidental expenses of $220.00, and survey fees and expenses of $2,809.95, and it lists the total as $19,574.99. Those three figures, however, add up to $17,356.84, not $19,574.99. Second, Macsteel's survey report lists its actual damages as $19,326.89, not $14,326.89, and it is not clear whether (or why) Macsteel intended to discount its actual damages by $5,000.00.

Additionally, Macsteel's survey report, dated June 30, 1999, refers to a prior survey report that supposedly details the results of chemical analyses indicating the damage was caused by seawater. Inexplicably, however, Macsteel has not made the prior report containing the chemical analysis part of the evidentiary record in this proceeding.

For all of these reasons, and especially in light of the presumption discussed above, the court finds that Macsteel has not met its burden of proof with respect to this claim.

### R. Additional Claims

United Arab apparently does not contest the remainder of Macsteel's damages claims. Accordingly, the court finds that Macsteel is entitled to recover $1,835.58 with respect to the Kodiak Metals claim and $8,920.55 with respect to the Merfish Supply Co. claim. The court also finds that Macsteel is entitled to recover a total of $9,461.69 with respect to the three initial surveys described in Macsteel's Exhibits 1–3.

### S. Prejudgment Interest

██ Although Macsteel requests that prejudgment interest be assessed at the New York statutory rate of 9%, the court finds, in exercising its discretion, that the 9% rate would give Macsteel somewhat of a windfall given the relatively inexpensive cost of capital since 1998. Accordingly, the court finds that Macsteel is entitled to simple (not compound) prejudgment interest at the rate of 8% per annum running from August 1, 1998.

### CONCLUSION

For the foregoing reasons, the court finds that Macsteel is entitled to recover from United Arab as follows:

| Claim: | Amount: |
| --- | --- |
| Thyssen Steel | $ 0.00 |
| Insteel Industries | $215,578.19 |
| Texas Pipe | $ 5,111.93 |
| New Process Steel (New Orleans) | $ 53,994.01 |
| New Process Steel (Chicago) | $ 73,094.73 |
| Russell–Stanley | $228,391.36 |
| May Fabricating | $117,989.26 |
| NAFTA | $ 46,314.30 |
| Vass Pipe | $ 41,990.89 |
| Madix | $ 34,634.80 |
| Trident | $ 27,989.78 |
| Watko | $ 22,252.84 |
| Tex–Tube | $ 14,642.02 |
| Galvmet | $ 2,960.95 |
| M & M Manufacturing | $ 0.00 |
| Cody | $ 0.00 |
| New Process Steel (Houston) | $ 0.00 |
| Kodiak Metals | $ 1,835.58 |
| Merfish Supply | $ 8,920.55 |
| Additional Surveys (Ex. 1–3) | $ 9,461.69 |
| Total: | $905,162.88 |

Macsteel is entitled to simple prejudgment interest at the rate of 8% per annum running from August 1, 1998. The claims against defendants Cargill Marine & Terminal and Cargo Carriers must be dismissed. An appropriate order is filed herewith.

### ORDER

For the reasons set forth in the Findings of Fact and Conclusions of Law filed simultaneously herewith, it is hereby **ORDERED, ADJUDGED** and **DECREED:**

1. That plaintiff Macsteel International USA Corporation have judgment against defendant United Arab Shipping Co. (S.A.G.) in the amount of $905,162.88, plus simple prejudgment interest at the rate of 8% per annum running from August 1, 1998.

2. That the claims against defendants Cargill Marine & Terminal Inc. and Cargo Carriers be **DISMISSED** and that judgment be entered in favor of defendants Cargill Marine & Terminal Inc. and Cargo Carriers with respect to all claims asserted by plaintiff against said defendants.

The Clerk of Court is directed to close this case and remove it from the court's active docket.

**SO ORDERED.**